# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL NO. 25- |
| --- | --- | --- |
| v. | : | DATE FILED: |
| ISAIAH ADAMS | : | VIOLATIONS: |
| | | 18 U.S.C. § 224 (bribery in sporting |
| | : | contests – 1 count) |
| | | 18 U.S.C. § 2 (aiding and abetting) |
| | : | Notice of Forfeiture |

## INFORMATION

## COUNT ONE

THE UNITED STATES ATTORNEY CHARGES THAT:

## INTRODUCTION

At all times relevant to this information:

1. The integrity of sporting contests rests on the fundamental principles of fairness, honesty, and respect for the rules of competition. To ensure fair outcomes, these contests depend upon genuine competition, free from corruption, manipulation, and bribery. In 1964, Congress enacted the Sports Bribery Act, codified at Title 18, United States Code, Section 224, to prohibit bribery in sporting contests, recognizing that corrupt influences undermine these principles and erode public confidence in the legitimacy of sport. This statute helps ensure that the organizing institutions, governing bodies, players, coaches, bettors, and fans can trust that every sporting contest is decided on merit, not by corruption.

2. The National Collegiate Athletic Association ("NCAA") was a non-profit organization that governed college sports and sporting contests in the United States. Collectively, there were more than 350 NCAA Division I colleges that fielded more than 6,000 sports teams

and provided opportunities for more than 170,000 players to compete in NCAA sports each year. The NCAA set and enforced rules promoting integrity, sportsmanship, and fair competition. Those rules included specific prohibitions on players, coaches, and other individuals associated with an NCAA sports team from participating in any sports wagering activity, including providing information to individuals involved in or associated with any type of sports wagering activities concerning intercollegiate, amateur, or professional athletics competition.

3. Under NCAA rules, players could earn money for the use of their name, image, and likeness ("NIL") through activities such as endorsements, sponsorships, and appearances. Division I players were also permitted to enter the "transfer portal" each year and transfer schools without penalty, and players frequently moved between schools in the hopes of obtaining more money through NIL activities or collectives and more opportunities on another team.

4. The Chinese Basketball Association ("CBA") was the governing body for basketball in China and the name of the country's top professional basketball league. The CBA comprised more than 300 players in its top men's league and about 20 teams, which represented cities and corporations throughout China.

5. Gambling outlets such as casinos, online wagering businesses, offshore betting houses, and illegal bookmakers, or "bookies," accepted wagers on sporting contests, including basketball games. These gambling outlets, often known as sportsbooks, used a "point spread" for sporting events such as basketball games, so that bettors could place wagers based on the relative performance of a team rather than simply betting on which team would win. The point spread was the predicted scoring difference between the two opponents in a sporting

contest. The point spread defined which team was the favorite and which team was the "underdog," that is, the predicted losing team. For a bettor to win a wager placed on the favorite team, the favorite team had to win by more than the point spread number. For a bettor to win a wager placed on the "underdog" team, the "underdog" team had to either win the contest, or lose by less than the point spread number. For example, if Team A was the "underdog" team by three points, then a bettor who bet on Team A would have won the wager if Team A either won the game, or if Team A lost the game by one or two points. Gambling outlets provided point spreads for the outcome of the entire game or a portion of the game, such as the first half or second half, allowing bettors to place multiple bets on a single game. In sports betting, to "cover" a point spread meant a team performed in a way that satisfied the conditions of the point spread set by oddsmakers.

6. Among the options for those wagering on sporting events with gambling outlets, individuals could also bet on games without regard to the point spread, by simply betting on a particular team to win a game. Those bets were called "money line" bets. Individuals could also make "parlay" bets, which were bets comprising two or more individual bets. To succeed on a parlay bet the bettor had to win all the bets made in the parlay. Parlay bets paid out at a higher rate than bets on individual games because they were more difficult to win.

7. A basketball game, or portion of a game, could be manipulated, or "fixed," by, among other means, a single player or multiple players on one team agreeing to influence the game's outcome, generally by underperforming or otherwise trying to limit the number of points scored by their team. This allowed individuals gambling on the score of the game, who were working with the players "fixing" the game, to profit by placing a wager on the game with a

3

higher degree of certainty as to the game's outcome. Such a scheme, customarily called "point shaving," involved an effort by a player or players to underperform in a game, or by some other means, to ensure that their team scored only a certain number of points during a game or during a portion of a game. The players involved in fixing a game altered their performance, or supported their teammates altering their performances, based on the point spread on that game so that their team would not "cover" the spread.

8. Defendant ISAIAH ADAMS was a basketball player in the NCAA. During the 2023-2024 season, defendant ADAMS was a forward on the State University of New York at Buffalo Bulls Men's Basketball Team ("Buffalo").

**THE SCHEME**

9. From at least in or about September 2022 through at least in or about February 2025, in the Eastern District of Pennsylvania, and elsewhere, defendant

**ISAIAH ADAMS**

along with others known and unknown to the United States Attorney, carried into effect, attempted to carry into effect, conspired with others to carry into effect, and aided and abetted the carrying into effect, the attempt to carry into effect, and the conspiracy to carry into effect, a scheme in commerce to influence by bribery sporting contests, that is, Chinese Basketball Association ("CBA") basketball games and National Collegiate Athletic Association ("NCAA") men's basketball games, with defendant ADAMS engaging in this scheme in connection with Buffalo men's basketball games, with knowledge that the purpose of this scheme was to influence in some way those contests by bribery.

## MANNER AND MEANS

It was part of the scheme that:

10. Beginning in or about September 2022, a group of individuals known to the United States Attorney ("the fixers") worked together to recruit and bribe players to help influence or "fix" CBA games through "point shaving" during the 2022-2023 season. The fixers bribed CBA players to fix games and then, through various gambling outlets, placed large wagers on those games against the teams whose players they had bribed.

11. After profiting on the fixed CBA games, the fixers turned their attention to NCAA men's basketball games. During the 2023-2024 and 2024-2025 NCAA men's basketball seasons, the fixers agreed to recruit NCAA players who would accept bribe payments in exchange for helping to influence outcomes of NCAA basketball games. In particular, the fixers agreed to recruit into the scheme players who would help ensure that their team failed to cover the spread of the first half of a game or an entire game. The fixers would then place wagers on those games through the gambling outlets, betting against the team whose player or players they had bribed to engage in this point-shaving scheme. Because of the proliferation of legalized sports betting, the fixers could use numerous gambling outlets to make their bets on these games and conceal the scheme from authorities.

12. Five of those fixers, Person A, Person B (charged elsewhere), Person C, Person D, and Person E, all known to the United States Attorney, then approached and communicated with NCAA basketball players, in person and through social media and cellular telephone calls. In these communications, the fixers offered the players bribe payments, usually ranging from $10,000 to $20,000 per game, to participate in the scheme. The fixers also

attempted to recruit multiple players from a team to join the bribery scheme and further ensure its success. Many of these players accepted the offers and agreed to help fix specific games so that the fixers would win their wagers. The fixers targeted for their scheme NCAA basketball players for whom the bribe payments would meaningfully supplement or exceed legitimate NIL opportunities.

13. Person A, Person B, Person C, Person D, and Person E had credibility with many of the players and could approach them to engage in this scheme because of their prominence, experience, and reputation in local and national basketball communities. Person A was a resident of North Carolina who was active in the training and development of basketball players for professional scouting combines. Person B was a resident of Florida and a former McDonald's All-American and college basketball player who also played professional basketball in the National Basketball Association ("NBA") and overseas and who had himself accepted bribes from his co-schemers to underperform in CBA games. Person C was a resident of Mississippi and a high-stakes sports gambler, social media influencer, and sports handicapper who sold betting advice to others. Person D was a resident of Arkansas and a former coach and trainer for high school and Amateur Athletic Union ("AAU") basketball teams and players. Person E was a resident of New York and a former college basketball player.

14. As the fixers had agreed, Person A, Person B, Person C, Person D, and Person E then communicated with the NCAA basketball players who had agreed to participate in the bribery scheme and directed them to underperform or otherwise help influence the outcome of particular games or a specific portion (generally the first half) of particular games.

15. Person A, Person B, Person C, Person D, Person E, and Person F, a resident of Philadelphia and Nevada and a high-stakes sports gambler, also known to the United States Attorney, as well as other co-schemers, then placed bets with numerous gambling outlets on NCAA men's basketball games involving the bribed NCAA players. They placed these bets in a manner that was consistent with the way in which they had arranged to fix the outcome of a game, or a portion of a game, to maximize their chances of winning their wagers. The bribed NCAA players then influenced, attempted to influence, and conspired to influence the outcome of their games through intentionally poor performances, removing themselves from games, supporting their teammates who were also involved in the scheme, and through other means.

16. At times, while Person F was in the Eastern District of Pennsylvania, the other fixers communicated and strategized about the scheme with Person F, and Person F placed bets on the fixed games with online gambling outlets and in person at casinos. At least one of those fixed games occurred in the Eastern District of Pennsylvania. In addition, individual bettors unaware of the scheme placed bets on the fixed games, often on the other side of the fixers' bets, in the Eastern District of Pennsylvania, resulting in losses to the individual bettors.

17. When the fixers were successful with their wagers on fixed games, Person A and other co-schemers traveled to NCAA school campuses and made cash bribe payments to the players who had agreed to participate in the scheme. On at least one occasion, Person A travelled to the Eastern District of Pennsylvania through the Philadelphia International Airport to pay one of the bribed players.

18. In or about late February 2024, one of defendant ISAIAH ADAMS' teammates on the Buffalo basketball team, Person G, approached defendant ADAMS and

recruited him to participate in the bribery scheme. Person G told defendant ADAMS that he was working with Person A who was offering bribe payments to Buffalo players who agreed to fix games through point shaving. Defendant ADAMS agreed to participate in this scheme.

19. In or about late February 2024, Person A, Person G, and defendant ISAIAH ADAMS recruited and engaged with an additional Buffalo player who also agreed to participate in this scheme—a Person H, known to the United States Attorney. Having additional players on a team join the scheme to fix a particular game made the scheme more successful because the co-schemers had more control over the outcome of the game.

20. Shortly before the men's basketball game between Buffalo and Western Michigan University ("Western Michigan") on February 24, 2024, Person A and Person B, along with defendant ISAIAH ADAMS, Person G, and Person H, engaged in FaceTime call in which the fixers told the players that, as part of their scheme, Buffalo should fail to cover the spread in the first half of the Western Michigan game. At that time, Western Michigan was favored by approximately 3 points for the first half at gambling houses throughout the United States and elsewhere. The players agreed to help influence the game so that Buffalo lost the first half by more than 3 points.

21. At various times before the men's basketball game between Buffalo and Western Michigan on or about February 24, 2024, participants in the scheme and others acting at their direction, placed wagers totaling at least $90,000 on Western Michigan to outscore Buffalo in the first half of the game by more than 3 points.

22. On or about February 24, 2024, in the men's basketball game between Buffalo and Western Michigan, defendant ISAIAH ADAMS and his teammates, Person G, and

Person H, helped ensure that Buffalo failed to cover the spread in the first half as they had agreed. Western Michigan outscored Buffalo 47 to 32, which was by more than the 3-point spread, resulting in Person A and his co-schemers winning their bets. Without any incentive among the Buffalo players in the scheme to underperform in the second half of the game, Buffalo played substantially better, with Western Michigan outscoring Buffalo by only 4 points. Notably, in connection with the scheme, the leading scorer on the Buffalo team, Person H, scored 6 points in the first half and 17 points in the second half.

23. Shortly after this game, on or about February 25, 2024, Person A traveled to Buffalo to deliver the bribe payments owed to defendant ISAIAH ADAMS, Person G, and Person H, for their roles in helping to ensure that Buffalo failed to cover the spread in the first half of its game against Western Michigan. After arriving in Buffalo, Person A met with defendant ADAMS, Person G, and Person H and provided them with cash for their participation in the bribery scheme.

24. Shortly before Buffalo's next game on or about February 27, 2024, against Kent State University ("Kent State"), Person A and Person B engaged in a FaceTime call with defendant ISAIAH ADAMS, Person G, and Person H. During this call, Person A again offered to pay the Buffalo players if Buffalo failed to cover the first-half point spread in the game against Kent State. At that time, Kent State was favored by approximately 8.5 points for the first half at gambling houses throughout the United States and elsewhere. The players agreed to continue the scheme for this game and help ensure that Buffalo did not cover the first-half point spread.

25. At various times before the men's basketball game between Buffalo and Kent State on or about February 27, 2024, participants in the scheme, including Person A, Person

C, and Person D, and others acting at their direction, placed at least $424,000 in wagers on Kent State, most of which for Kent State to outscore Buffalo in the first half of the game by more than 8.5 points.

26. On or about February 27, 2024, in the men's basketball game between Buffalo and Kent State in Kent, Ohio, Kent State outscored Buffalo in the first half by 8 points, resulting in the co-schemers losing most of their bets by only ½ point. With the score tied at 27 with 4:40 left to go in the first half, Kent State scored the last 8 points of the half, and Buffalo did not score again. In the last 13 minutes of the first half, defendant ISAIAH ADAMS, Person G, and Person H scored a total of 1 point, missing several shots, including layups and dunks, and committing several turnovers.

27. On or about March 2, 2024, at the direction of Person A, Person E traveled to Buffalo to deliver approximately $54,000 in bribe payments to defendant ISAIAH ADAMS, Person G, and Person H, for their roles in fixing Buffalo men's basketball games.

28. Shortly before Buffalo's next game on or about March 5, 2024, against Ohio University ("Ohio"), Person A and Person B engaged in a FaceTime call with defendant ISAIAH ADAMS, Person G, and Person H. During this call, Person A told the Buffalo players to ensure that Buffalo fails to cover the first-half point spread in the game against Ohio. At that time, Ohio was favored by approximately 5.5 points for the first half at gambling houses throughout the United States and elsewhere. The players agreed to continue the scheme for this game and help ensure that Buffalo did not cover the first-half point spread.

29. At various times before the men's basketball game between Buffalo and Ohio on or about March 5, 2024, participants in the scheme, including Person F, and others

10

acting at their direction, placed wagers on Ohio to outscore Buffalo in the first half of the game by more than 5.5 points. These scheme participants also placed "parlay" wagers on games that included Buffalo and other teams whose players they were bribing to influence their games.

30. On or about March 5, 2024, in the men's basketball game between Buffalo and Ohio in Amherst, New York, defendant ISAIAH ADAMS and his teammates, Person G, and Person H, helped ensure that Buffalo failed to cover the spread in the first half as they had agreed. Ohio outscored Buffalo 40 to 33, which was by more than the spread of 5.5 points, resulting in Person A and his co-schemers winning numerous bets.

All in violation of Title 18, United States Code, Sections 224 and 2.

## NOTICE OF FORFEITURE

1. As a result of the violation of Title 18, United States Code, Section 224, bribery in sporting contests, as set forth in this information, defendant

**ISAIAH ADAMS**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violation, including, but not limited to, the sum of at least $17,500.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

*Salvatore L. Astolfi for*
**DAVID METCALF**
**UNITED STATES ATTORNEY**

No. _ _ _ _ _ _ _ _ _ _

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

Criminal Division

THE UNITED STATES OF AMERICA

vs.

ISAIAH ADAMS

**INFORMATION**

18 U.S.C. § 224 (bribery in sporting contests – 1 count)
18 U.S.C. § 2 (aiding and abetting)
Notice of Forfeiture

A true bill.

_____
Foreman

Filed in open court this _____ day,
Of _____ A.D. 20_____

_____
Clerk

Bail, $_____